UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| HERMAN ALTON BROADWAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:05-1083 |
| | ) | Judge Trauger |
| v. | ) | |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This case comes before the court on a Motion for Summary Judgment filed by the defendant (Docket No. 15), to which the plaintiff has responded (Docket No. 24), and the defendant has replied (Docket No. 30). For the reasons discussed herein, the defendant's motion will be granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Herman Alton Broadway has been employed with United Parcel Service, Inc. ("UPS") as a part-time center clerk since 1989, performing such job duties as correcting addresses for undeliverable packages, preparing undeliverable packages for returning to shipper, and occasionally carrying packages to customers' cars.[1] Mr. Broadway is a member of the International Brotherhood of Teamsters, Local 840 and, therefore, the terms and conditions of his employment are governed by a collective bargaining agreement entered between UPS and the

---

[1] Unless otherwise noted, the facts have been drawn from the plaintiff's Complaint (Docket No. 1), and the defendant's Statement of Undisputed Material Facts (Docket No. 16). Because the plaintiff did not respond to the defendant's Statement of Undisputed Material Facts, each fact in that statement is considered by the court to be undisputed for purposes of summary judgment, pursuant to Local Rule 56.01(g).

1

union.  In addition to his official duties, Mr. Broadway has, from time to time, driven package cars and air vans the roughly two-hundred yard distance between the hub and the customer counter.  However, in January 2004, Mr. Broadway's supervisors, Robert Businda and Robert Vaughan, having just recently learned of Mr. Broadway's driving tasks, asked him to stop performing this function because he lacked the proper certification to drive the vehicles.

Mr. Broadway lacked this certification because he is legally blind in his left eye, due to a condition called irremediable amblyopia, which was itself caused by a congenital facial disfigurement affecting the left side of his face, called hemangioma.  Mr. Broadway's visual acuity in his left eye is 20/200, his visual acuity in his right eye is 20/13, and his combined visual acuity is 20/15.  Mr. Broadway alleges to have applied for full-time positions with UPS as a package car driver numerous times over the course of ten years—from 1994 to 2004—by signing written bid sheets.  Each time Mr. Broadway was refused the job.  Most recently, Mr. Broadway sought the position in March and October 2004, and was refused.

In order to become eligible for consideration for the position of package car driver at UPS, a candidate must, among other criteria, complete a physical, the guidelines for which have been established by the United States Department of Transportation ("DOT"), at a UPS-approved clinic, and submit a valid DOT card signed by a physician at that clinic.  UPS provides employees seeking a package car driver position the appropriate forms to be used at this physical, along with a self-addressed UPS Next Day Air envelope, in which the physician is to return the forms to UPS.  The package car driver position is then offered to the candidate on the bid sheet who meets all of the qualifications—including the examination outlined above—and with the most seniority.  If the most senior candidate does not meet all of the qualifications, or

declines the position for some other reason, the position is offered to the next senior candidate who does meet the qualifications.

Mr. Broadway has not sought examination for DOT certification by a UPS-approved physician, although UPS has provided the plaintiff with the necessary forms. Mr. Broadway has applied to the DOT for an exemption from the vision requirements, but the DOT denied his request. In addition, Mr. Broadway alleges that he obtained a DOT card from his primary physician, Dr. Steven Kinney, certifying that he is capable of driving vehicles weighing ten thousand pounds or more, notwithstanding his amblyopic left eye. However, UPS will not accept this card and, instead, requires certification from its approved physicians. UPS alleges that it requires the certification exam to be performed by its approved physicians "to ensure consistency, streamline administrative resources, and reduce costs." (Docket No. 17 at p. 11)

Mr. Broadway alleges to have received a valid DOT card from his physician, and he has produced a "Physical Examination Form" subtitled "Meets Department of Transportation Requirements," signed by his physician, Steven R. Kinney. The form states that Mr. Broadway is qualified under the Federal Motor Carrier Safety Regulations, 49 C.F.R. §§ 391.41-49, to drive all covered vehicles. (Docket No. 15, Ex. 3 at p. 1) Among its minimum requirements 49 C.F.R. § 391.41 includes the following:

> *Has distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or visual acuity separately corrected to 20/40 (Snellen) or better with corrective lenses,* distant binocular acuity of at least 20/40 (Snellen) in both eyes with or without corrective lenses, field of vision of at least 70° in the horizontal Meridian in each eye, *and* the ability to recognize the colors of traffic signals and devices showing standard red, green, and amber.

49 C.F.R. § 391.41(b)(10) (emphasis added). Mr. Broadway admits that he is legally blind in his left eye, with a visual acuity of only 20/200, which cannot be corrected with lenses. Therefore,

according to Mr. Broadway's own statements, he does not meet the requirements that his DOT form—signed by his physician—states that he meets.

In late 2004, Mr. Broadway alerted UPS to inappropriate comments made by customer counter clerks Vicki Lowe, Connie Hessey, and Madeline Boyd to a co-worker, Roger Matthews, about his sexual orientation. UPS investigated Mr. Broadway's complaint by interviewing Mr. Matthews, Ms. Hessey, Ms. Boyd, and Mr. Broadway. Ms. Lowe, Ms. Hessey, and Ms. Boyd each received warning notices.

Although Mr. Broadway's job title has always been "center clerk," for a long time he also performed work at the customer counter. Mr. Broadway performed this work because customer counter clerks were non-union employees and, therefore, could not "progress" packages, work which is reserved for members of the collective bargaining unit. In August 2003, however, the customer counter clerks became unionized and could, from that time forward, "progress" packages themselves. Accordingly, UPS began reassigning center clerks, including Mr. Broadway, to the "hub." Mr. Broadway suffered no change in pay, benefits, seniority, or job status as a result of this reassignment.

Nevertheless, since the unionization, some center clerks have continued working at the customer counter, outside of their job duties, in violation of the collective bargaining agreement. In January 2005, Ms. Hessey filed a grievance with the union, alleging that Mr. Broadway had been working outside of his job duties by working at the customer counter. In accordance with the settlement entered between UPS and the union, UPS agreed to comply with the new collective bargaining requirements and instructed the center clerks, including Mr. Broadway, not to work outside their job duties.

4

In addition, Mr. Broadway alleges that, in January 2004, Chris Jones, a part-time supervisor at UPS, bumped him in the chest twice and that, in 2005, B.J. Hughes, a part-time supervisor, shut a door in his face.

On November 9, 2004[2], and January 10, 2005, the plaintiff filed discrimination charges with the Equal Employment Opportunity Commission, alleging disability discrimination and unlawful retaliation. On September 29, 2005, the plaintiff received a right-to-sue letter from the EEOC. The plaintiff filed this case on December 28, 2005, alleging (1) unlawful employment discrimination on the basis of disability, in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12111(a), *et seq*., and (2) unlawful retaliation in violation of Title VII of the Civil Rights Act and the Civil Rights Act of 1991.[3] On February 5, 2007, the defendant moved for summary judgment. (Docket No. 15)

## ANALYSIS

---

[2]The defendant's Statement of Undisputed Material Facts (Docket No. 16 at ¶ 22), to which the plaintiff did not reply, states that the plaintiff filed discrimination charges "[o]n November 9, 2005, and January 10, 2005." The defendant cites to the Charges of Discrimination themselves in support of this statement, which were Exhibits 1 and 2 to the plaintiff's deposition. The Charges of Discrimination, however, are dated November 9, 2004, and January 10, 2005, respectively. The court will treat this discrepancy as an inadvertent mistake on the part of the defendant, and will consider the date of the first Charge of Discrimination to have been November 9, 2004.

[3]Additionally, the plaintiff's complaint states that the defendant "has violated the Common and Statute Law of the State of Tennessee including, but not limited to, Tenn. Code Ann. § 4-21-101, *et seq*., 'Tennessee Human Rights Act,'" but does not proceed to allege any specific violation of that statute. Because Tennessee courts look to federal law for guidance in enforcing the Tennessee Human Rights Act ("THRA"), any disability claim the plaintiff might have brought under the THRA would be analyzed in the same manner as the plaintiff's ADA claim. *See Pruett v. Wal-Mart Stores, Inc.*, No. 02A01-9610-CH-00266, 1997 WL 792960 at *12 (Tenn. App. 1997) ("Tennessee utilizes federal decisions construing parallel employment law to determine the standard by which Tennessee courts will weigh the evidence in these types of cases.") (citing *Bruce v. Western Auto Supply Co.*, 669 S.W.2d 95 (Tenn. App. 1984)).

5

**I.     Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving

6

party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

## II. Unlawful Discrimination In Violation Of The ADA

The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). ADA claims follow the burden-shifting structure set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). *See Plant v. Morton Intern, Inc.*, 212 F.3d 929, 936 (6th Cir. 2000). Under the *McDonnell Douglas* structure, the court must first determine whether the plaintiff has adequately demonstrated a *prima facie* case. *McDonnell Douglas Corp.*, 411 U.S. at 802. If the plaintiff does demonstrate a *prima facie* case, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the adverse employment action. *Id*. If the defendant succeeds, the burden shifts back to the plaintiff to demonstrate that the reason offered by the defendant was not its true motivation, but rather, a pretext for discrimination. *Id*. Because the

7

plaintiff has failed to demonstrated a *prima facie* case, the remaining stages of the analysis are unnecessary.

To establish a *prima facie* case for unlawful discrimination under the ADA, the plaintiff must show (1) that he is an individual with a disability; (2) that he is otherwise qualified to perform the job requirements, with or without reasonable accommodation; and (3) that he was discharged or subject to an adverse employment decision because of the disability. *See Henderson v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001); *Walsh v. United Parcel Serv.*, 201 F.3d 718, 724 (6th Cir. 2000); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996).

Because the plaintiff has not demonstrated that he qualifies as an individual with a disability under the ADA, and because he has not shown that he was otherwise qualified for the package car driver position, the court finds that he has not established a *prima facie* case.

### A. The Timeliness Of Mr. Broadway's Claims

Under 42 U.S.C. § 2000e-5(e)(1), a dual limitations regime applies to the plaintiff's claims, which the Sixth Circuit has explained as follows:

> Usually, if the alleged discrimination occurred more than 180 days prior to the plaintiff's filing of an EEOC charge, claims implicating these actions are barred. However, if the alleged unlawful practice occurs in a "deferral state" . . . which has enacted its own laws prohibiting discrimination in employment, the plaintiff must file suit within 300 days of the alleged discriminatory act.

*Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 407 (6th Cir. 1999); *see also Amini v. Oberlin College*, 259 F.3d 493, 498 (6th Cir. 2001). Tennessee is a deferral state and, therefore, the plaintiff was required to bring an EEOC charge within 300 days of each alleged discriminatory act. *See Howlett v. Holiday Inns, Inc.*, 49 F.3d 189, 197 (6th Cir. 1995).

8

The period begins to run from the date of "the alleged unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). The Sixth Circuit has clarified that "the starting date for the 300-day limitations period is when the plaintiff learns of the employment decision itself, not when the plaintiff learns that the employment decision may have been discriminatorily motivated." *Amini*, 259 F.3d at 498. Mr. Broadway filed his first EEOC charge on November 9, 2004; accordingly, the plaintiff's claim under the ADA is limited to alleged acts of discrimination that took place on or after January 14, 2004.

In what may be an attempt to include incidents occurring earlier than January 14, 2004, the plaintiff has characterized his applications for the package car driver position—the first of which occurred in 1994—and the defendant's rejection of those applications, as discrimination that is "continuing in nature." However, the Supreme Court has held that the "continuing violations doctrine" does not apply to serial violations that are separate in nature. *See Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Because "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," each such incident or adverse decision "constitutes a separate actionable 'unlawful employment practice.'" *Id.* Accordingly, each such incident must be included in a timely EEOC complaint, or it is no longer actionable. *Id.*; *see also Sharpe v. Cureton*, 319 F.3d 259, 267 (applying the Supreme Court's rule in *Nat'l Railroad Passenger* in the § 1983 setting).

Any of the defendant's refusals to hire the plaintiff as a package car driver that may have occurred before January 14, 2004—being each discrete, separable acts—are time-barred. The court will address only those claims arising on or after January 14, 2004.

**B.     An Individual With A Disability**

9

The ADA defines the term "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 1210(2). According to the EEOC's regulations, "major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The plaintiff has alleged only that he is disabled under option (A), in that he has a physical impairment substantially limiting one or more life activities.

In *Albertson's, Inc. v. Kirkinburg*, 527 U.S. 555, 559-60 (1999) the Supreme Court addressed the "disability" requirement in a context the parties in this case should find very familiar: a plaintiff with monocular vision, due to congenital amblyopia, who desired, but was refused, a position driving commercial vehicles. The Court did not analyze options (B) or (C), those issues not having been properly raised on appeal. *Id.* at 563. In analyzing option (A)—whether or not the physical or mental impairment "substantially limits one or more" major life activities—the Court held that lower courts should take into consideration "whether the individual had learned to compensate for the disability" with internal measures or artificial aids. *Id.* at 565-66; *see also Knapp v. City of Columbus*, 192 Fed. Appx. 323, 329 (6th Cir. 2006) ("When an ADA plaintiff can fully compensate for an impairment through medication, personal practice, or an alteration of behavior, a disability under the Act does not exist.") Without any evidence as to the plaintiff's current limitations created by the underlying condition, the court held that disability could not be demonstrated. *Id.*

Under the Court's ruling in *Kirkinburg*, it is not enough for the plaintiff to show that he is monocular, but he must in addition "prove disability by offering evidence that the extent of the

10

limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial." *Id*. at 567. The Court also noted that monocular individuals would not normally "have an onerous burden" and that people with monocular vision often would meet the Act's definition of disability. *Id*. However, that burden must still be met. *Id.*, *see also EEOC v. United Parcel Serv., Inc.*, 306 F.3d 794, 797 (9th Cir. 2002) ("[W]e hold that for a monocular individual to show that his impairment is a substantial limitation on the major life activity of seeing, the impairment must prevent or severely restrict use of his eyesight compared with how unimpaired individuals normally use their eyesight in daily life."); *Amann v. Potter*, 105 Fed. Appx. 802, 806 (6th Cir. 2004) ("[H]aving an impairment that limits the performance of some manual tasks does not necessarily constitute a disability. . . . Rather, the individual must also offer evidence that the extent of the limitation . . . is substantial.") (internal citations omitted).

The plaintiff in this case has gone no further to offer evidence of the extent of his disabilities than to name the impairments from which he suffers. The plaintiff suffers from hemangioma, a congenital facial disfigurement of the left side of his face, and is legally blind in his left eye. Although the court does not take the plaintiff's condition lightly, under *Kirkinburg*, it is simply insufficient for the plaintiff to provide the court with the medical name of his disorder and nothing else. Further, the plaintiff stated at his deposition that the only thing his disability has prevented him from doing is to "work full time at UPS." (Docket No. 15, Ex. 1 at p. 51-53) He has also admitted that his "hemangioma has had no effect on his ability to perform his job at UPS or any other physical activity." (Docket No. 16 at ¶ 6) Accordingly, the plaintiff has failed to demonstrate that he qualifies as a disabled person under 42 U.S.C. § 1210(2).

**C.** **Otherwise Qualified To Perform The Essential Functions**

11

In addition, the plaintiff's *prima facie* case fails because he has not shown that he is otherwise qualified for the package driver position. Under § 12111(8) of the ADA, a "qualified individual with a disability" is defined as an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Further, the ADA provides that employers are entitled to use "qualification standards . . . that screen out or tend to screen out an individual with a disability," provided that the standards are "job-related for the position in question and [are] consistent with business necessity." 42 U.S.C. § 12112(b)(6). *See Gann v. Chevron Chemical Co.*, 52 F. Supp. 2d 834, 842, (E.D. Tenn. 1999).

In *Kirkinburg*, the Supreme Court also addressed whether the plaintiff—who had obtained a waiver from the DOT regarding his monocular vision—was a "qualified individual." The Court held that he was not, reasoning that, even though the DOT regulations included a waiver program, the defendant was permitted to rely on the general requirements established by Congress. *Id.* at 575-77. Otherwise, the court reasoned, "an employer would . . . have an obligation of which we can think of no comparable example in our law. The employer would be required in effect to justify *de novo* an existing and otherwise applicable safety regulation issued by the Government itself." *Id.* at 577.

In the case at hand, the plaintiff actually applied to the DOT for a waiver of the Federal Motor Carrier Safety Regulations and was denied that waiver. Subsequently, although he admits that he does not meet the minimum requirements of the DOT regulations, the plaintiff has nevertheless obtained DOT certification from his physician. The specific job requirement issue, therefore, is not whether the plaintiff must obtain a DOT card—he has obtained one, through

12

some means—but whether the defendant may require the plaintiff to follow its own methodology and to consult its own preferred physicians in order to obtain DOT certification. The issue could also be framed as whether the defendant may deny the plaintiff the package driver position on the basis that he does not meet the minimum requirements established by the DOT, although he has inexplicably obtained a card saying that he does.

The court is persuaded that the answer to this question should be in the affirmative. The defendant has articulated sound reasons for requiring examination by its preferred physicians, including "[t]o ensure consistency, streamline administrative resources, and reduce costs." (Docket No. 17 at p. 11). Another reason that might be added is to ensure that applicants who do not meet the Federal Motor Carrier Safety Regulations promulgated by the DOT do not obtain cards saying that they are "DOT certified." Certainly, if the defendant can require applicants to obtain DOT certification, they can also require that the applicants actually satisfy the DOT's minimum physical requirements. Accordingly, the court finds that the plaintiff has failed to demonstrate a *prima facie* case of discrimination under the ADA and, therefore, the court must grant the defendant summary judgment as to that claim.

## III.  Unlawful Retaliation In Violation Of Title VII

The plaintiff asserts that he was retaliated against in violation of Title VII for reporting an act of harassment to his supervisor. Title VII cases follow the burden-shifting structure set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802 (1973), outlined above. After the plaintiff demonstrates a *prima facie* case, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the adverse employment action. *Id*. If the defendant succeeds, the burden shifts back to the plaintiff to demonstrate that the reason offered by the defendant was not

13

its true motivation, but rather, a pretext for discrimination. *Id.*; *see also Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004); *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997). As with the plaintiff's ADA claim, because he does not set forth an adequate *prima facie* case, the remaining stages of the analysis as to the Title VII claim are unnecessary.

To establish a *prima facie* case for a retaliation claim, the plaintiff must show the following: (1) that he engaged in activity protected by Title VII, (2) that the defendants knew he engaged in protected activity, (3) that he suffered an adverse employment decision, and (4) that a causal connection exists between the protected activity and the adverse action taken against the plaintiff. *Siegfield*, 389 F.3d at 565, *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987). Alternatively, Mr. Broadway can establish a *prima facie* case by proving that he was "subjected to severe or pervasive retaliatory harassment by a supervisor" and that there was a causal connection between the protected activity and the harassment. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). The plaintiff has failed to demonstrate either a sufficient retaliatory action or severe or pervasive retaliatory harassment by a supervisor. Therefore, he has failed to demonstrate a *prima facie* retaliation case.

### A. An Adverse Employment Decision

In *Burlington Northern & Santa Fe Railway Co. v. White*, --- U.S. ---, 126 S.Ct. 2405, 2410 (2006), the Supreme Court addressed how harmful an act of retaliatory discrimination must be to fall within Title VII's scope. The Supreme Court rejected the requirement of a "link between the challenged retaliatory action and the terms, conditions, or status of employment," holding instead that "the scope of the anti-retaliation provision extends beyond workplace-related or employment-related acts and harms." *Id.* at 2411, 2414.

In addition, the Court created a new, objective standard for determining when conduct becomes actionable retaliation: "A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 2415. The Court cautioned that "[w]e speak of material adversity, because we believe it is important to separate significant from trivial harms." *Id*.; *see also Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (holding that Title VII does not create "a general civility code for the American workplace"). Reasoning that the purpose of Title VII's anti-retaliation provision is to prohibit "employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,'" *id*. (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997), the court explained that "petty slights and minor annoyances" could not give rise to a retaliation claim because they normally "will not create such deterrence." *Id*.

Applying this new standard, the Supreme Court held that reassigning the plaintiff from forklift duty to standard track laborer tasks and a 37-day suspension without pay were sufficiently harmful retaliatory actions to support a Title VII retaliation claim. *Id*. at 2416-17; *see also Halfacre v. Home Depot, U.S.A., Inc.*, No. 05-6619, 2007 WL 1028860 at *8-9 (6th Cir. Apr. 3, 2007) (unpublished) (holding that negative performance evaluations could constitute a materially adverse action if they "significantly impact an employee's wages or professional advancement"); *but see Freeman v. Potter*, 200 Fed. Appx. 439, (6th Cir. 2006) ("In general, a lateral transfer, or the refusal to make a lateral transfer, is not a materially adverse action."); *James v. Metropolitan Government of Nashville*, No. 04-5874, 2007 WL 1786792 at *4 (6th Cir. 2007); *Secherest v. Lear Siegler Services, Inc.*, No. 3:06-cv-0336, 2007 WL 1186597 at *4

15

(M.D. Tenn. 2007) (holding that job transfers and disciplinary write-ups that did not affect the plaintiff's pay, hours, or job duties did not constitute a materially adverse action).

Although, in *Burlington*, the Supreme Court found that the plaintiff's reassignment was significant, it also stated that, "[t]o be sure, reassignment of job duties is not automatically actionable." *Burlington*, 126 S.Ct. at 2417. Instead, the Court reasoned that, "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* (quoting *Oncale*, 523 U.S. at 81). The transfer in *Burlington* could be considered retaliatory only because:

> [T]he jury had before it considerable evidence that the track labor duties were by all accounts more arduous and dirtier; that the forklift operator position required more qualifications, which is an indication of prestige; and that the forklift operator position was objectively considered a better job and the male employees resented [the plaintiff] for occupying it.

*Id.* (internal quotations omitted).

Similarly, in *Freeman*, the Sixth Circuit addressed whether the defendant's failure to transfer the plaintiff to an allegedly more prestigious postmaster position could constitute Title VII retaliation. *Freeman*, 200 Fed. Appx. at 445. Although the plaintiff had testified "in general" that postmaster positions are considered desirable and are highly sought-after, "[s]he did not offer any specific comparison between the prestige of the two particular positions at issue" in the case. *Id.* Accordingly, the court found that the plaintiff's "entirely conclusory" evidence could not show that the failure to transfer was retaliatory. *Id.*

The record in this case regarding the plaintiff's transfer is even more paltry than that in

16

*Freeman*.[4]  The plaintiff alleges that the transfer was materially adverse because it deprived him

"of engaging in visual contact with the public."  However, the plaintiff has not offered any

evidence as to why the lack of visual contact with the public renders his reassignment to the hub

"materially adverse."[5]  The court cannot assume that all assignments with visual public contact

are preferable to those without such contact.  Further, the plaintiff does not deny that he suffered

no change in pay, benefits, seniority, or job status as a result of his reassignment, nor that he has,

---

[4]The paucity of the plaintiff's factual record is not exclusive to this count.  In opposition to the defendant's summary judgment motion, the plaintiff has responded with one four-page brief, excerpts from two depositions, and no affidavits.

[5]The plaintiff has supported his retaliation claim with references to audio recordings surreptitiously made by him.  The defendant has objected to certain of those, calling them "rank hearsay."  (Docket No. 30 at p. 3).  Because the plaintiff has not filed the recordings with the court, the court has no way of making a judgment as to their evidentiary value.  Moreover, even if the taped conversations are as the plaintiff alleges them to be, they would do nothing to ameliorate the flaws in the plaintiff's case.

The first reference to the tapes is cited in support of the statement: "because of his disability, Mr. Broadway was repeatedly denied the job of full-time package car driver." (Docket No. 25 at p. 3)  In addition to his citation to the audio recordings, Mr. Broadway cites to pages 168-188 of his deposition in support of this statement.  Those pages indicate, at best, that Mr. Broadway was told that he could not obtain the package driver position because he lacked 20-40 vision in one of his eyes.  Even assuming that Mr. Broadway was told this within the relevant time frame of his EEOC complaints, all the evidence amounts to is that UPS employees informed the plaintiff about the actual substance of the DOT regulations and about the plaintiff's inability to qualify under those regulations.  If an employer is permitted to rely on the DOT regulations in making employment decisions, it may also inform applicants of the substance of those regulations.

The second citation to the tapes supports the statement: "in late 2004, Plaintiff, Herman Alton Broadway, complained to his supervisors, Leonard Wall and Sandra Lemmons, respecting the sexually explicit remarks being made (within Plaintiff's hearing) by two of Plaintiff's coworkers about a third male homosexual coworker."  (*Id.*)  The parties do not dispute that the plaintiff made this complaint, and the substance of the conversation between the plaintiff's coworkers is not relevant to the analysis in this opinion.  Assuming that Mr. Broadway had ample reason to complain, the court still finds that Mr. Broadway did not suffer any retaliatory action or harassment.

17

throughout his career, been employed as a "center clerk" and not a "customer counter clerk." Instead, the record shows that the plaintiff was transferred according to a new collective bargaining agreement regarding the customer counter clerks, negotiated by the plaintiff's union. A reasonable employee would not have found this transfer to be materially adverse nor have been, on the basis of the transfer, dissuaded from bringing complaints under Title VII. Instead, a reasonable employee would have understood that the transfer was mandated by his own union's grievance process. *C.f., Amann*, 105 Fed. Appx. at 807-8 (holding that a transfer accompanied by a change in shift did not constitute an adverse action).

### B. Severe Or Pervasive Harassment By A Supervisor

A plaintiff may also establish a *prima facie* case by showing that his protected activity caused him to be severely or pervasively harassed by a supervisor at work. *Morris v. Oldham County Fiscal Court*, 201 F.3d at 792. However, Mr. Broadway has not done so.

The Sixth Circuit has held that "the standard for severe or pervasive harassment is the same in the retaliation context as in the sexual and racial discrimination contexts." *Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir. 2003) (internal citations omitted). That standard requires that "the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id*. (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)). The test has both an objective and a subjective element: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as hostile or abusive." *Akers*, 338 F.3d at 498 (internal citations omitted).

The plaintiff alleges that, in January 2004, Chris Jones, a part-time supervisor at UPS,

18

bumped him in the chest twice and that, in 2005, B.J. Hughes, a part-time supervisor, shut a door in his face. Mr. Jones' alleged bumps occurred in January 2004, before the plaintiff engaged in any protected activity and, accordingly, cannot constitute evidence of retaliatory harassment. We are left with one incident of a door being shut in the plaintiff's face. The plaintiff has produced no evidence that he subjectively regarded this incident as having created an abusive or hostile work environment, and the court finds that a reasonable person could not consider it to have done so. Accordingly, the court finds that the defendant is entitled to summary judgment on the plaintiff's retaliation claim.

## CONCLUSION

For the reasons stated herein, the defendant's Motion for Summary Judgment will be granted. The plaintiff's claims under the ADA and under Title VII will be dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

19